OPINION OF THE COURT
Joseph Kevin McKay, J.
INTRODUCTION
Petitioner landlord (Doubledown) brought this summary holdover proceeding pursuant to RPAPL 713, contending that respondent tenant (Gibbs) was a mere licensee in the subject rent-controlled apartment, whose right to occupy the premises ended with the death of her mother, the statutory tenant. Gibbs, on the other hand, claims to have succeeded her mother as the rent-controlled tenant or, failing that, asserts that Doubledown affirmed her tenancy by accepting her rent.
THE FACTS
In March, 1971 Gibbs’ father Elwood Harris leased these rent-controlled premises, apartment No. 2A at 312 Manhattan Avenue in Manhattan, from Doubledown’s predecessor in interest. Mr. Harris lived in the apartment with his wife Evelyn Harris and some other family members. He died in the late 1970’s and his wife then became the prime statutory tenant. Just when and for how long Gibbs herself *33 occupied the premises was disputed at trial, but it was uncontested that Gibbs’ three children lived there during this period and were cared for by Gibbs’ mother. The evidence also disclosed that Gibbs lived in several other different residences in the city from time to time during this period.
In or about May, 1982 Evelyn Harris entered the hospital on account of a terminal illness and she died on November 18, 1982. This fact and the presence of Gibbs in the apartment became known to Doubledown quickly, certainly by December, 1982. After her mother’s death and for the next four months Gibbs paid rent for the apartment with money orders bearing the name of her already deceased mother. Thereafter, from April through July, 1983 (when this proceeding was commenced) Gibbs sent similar money orders with her own name to Doubledown as rent. None of these money orders was cashed, by Doubledown (until an order of this court permitted it in August without prejudice to either side’s position on this “waiver” issue), but neither were they ever returned to Gibbs. Moreover, although Doubledown began a holdover proceeding against Gibbs in February, 1983 which was voluntarily discontinued without prejudice in April, it never notified Gibbs that her rental payments were not being accepted.
RENT CONTROL REGULATIONS
Initially, we confront the issue of whether Gibbs’ occupancy prior to November, 1982 suffices to entitle her to succeed to the rent-controlled statutory tenancy of her deceased mother. Subdivision 4 of section 56 of the New York City Rent and Eviction Regulations (9 NYCRR 2104.6 [d]) provided as follows: “No occupant of housing accommodations shall be evicted under this section where the occupant is either the surviving spouse of the deceased tenant or some other member of the deceased tenant’s family who has been living with the tenant.” Based upon a preponderance of the credible evidence I find that Gibbs stayed at the subject apartment only sporadically and infrequently over the course of the 10-year period during which her now deceased mother resided there, before her hospitalization and death in 1982. I therefore must conclude that Gibbs did not reside with her mother in the *34 apartment for any substantial period of time preceding her mother’s death and that she is therefore not entitled to succeed her mother as the statutory tenant on the basis of prior residency under the Rent and Eviction Regulations.
WAIVER AND ESTOPPEL
Gibbs’ second defense stands on a different footing. She maintains that the landlord’s retention of her tendered rental payments for eight months constitutes an acceptance of rent and an affirmance of her tenancy on a month-to-month basis. Doubledown counters by asserting that the proof did not show a knowing and intentional waiver of its right to evict her. In support of this contention Doubledown points to the fact that the money orders were not cashed, that some bore the name of Gibbs’ deceased mother and that the first holdover action, begun in February, 1983 and voluntarily discontinued without prejudice on April 14, 1983, negates any intentional waiver.
As the primary authority for its position, Doubledown cites the recent decision in A & V Holding Corp. v Elmore (NYLJ, June 24, 1983, p 6, col 1 [App Term, 1st Dept]), which reversed the Civil Court’s finding of a waiver in a situation where a subtenant held over and had been sending rent to the landlord’s designated lock-box. (The lock-box method of receiving rent is a previously recognized exception to the rule that the acceptance of rent constitutes a waiver of a then existing, known breach. (Rondat, Inc. v Tublin, NYLJ, July 10, 1981, p 4, col 3 [App Term, 1st Dept].) Appellate Term in A & V Holding Corp. found that there was no knowing acceptance of rent after the surrender of prime tenant, which gave rise to the holdover proceeding, and further found that no waiver or estoppel was created because the landlord’s conduct did not reasonably lead respondent to believe she was a permanent tenant. The court referred in its decision to the classic definition of waiver found in Hadden v Consolidated Edison Co. (45 NY2d 466) and New York Jurisprudence (vol 21, Estoppel, Ratification, and Waiver, § 93, p 131).
Judged by the traditional criteria for waiver, Double-down’s conduct in retaining Gibbs’ money orders cannot be said to have been “‘so inconsistent with (the landlord’s) purpose to stand upon his rights as to leave no opportunity *35 for reasonable inference to the contrary’ (A & V Holding Corp. v Elmore, supra, p 6, col 2, quoting 21 NY Jur, Estoppel, Ratification, and Waiver, § 93, p 132.) Indeed, it would seem that in most if not all cases where a landlord retains, but does not cash, a tenant’s rental check or money order, such conduct would not point unequivocally and exclusively to an intention to affirm the tenancy, but rather would evince a “hedging one’s bet” and a “wait and see” attitude. This does not constitute a pure waiver.
The landlord in this case is not “home free,” however, because of the related but distinct concept of (equitable) estoppel, also mentioned by Appellate Term in A & V Holding Corp. (supra). While the waiver issue focuses upon the landlord’s intent, estoppel looks to the effect the landlord’s conduct has upon the tenant. (21 NY Jur, Estoppel, Ratification, and Waiver, §16, p 22.) If the landlord’s conduct in retaining the tenant’s rental payments reasonably induced the tenant to believe that her tenancy was being recognized, and if the tenant acts or fails to act in reliance on that belief, then an estoppel has been created. It is in this vein that I believe the line of cases can best be understood which were cited by respondent for the proposition that retention of rental checks by a landlord without cashing them must be deemed as acceptance of the rent and an affirmance of the tenancy. (See Hamann v Claxton, 110 NYS2d 138 [App Term, 1st Dept]; Mobil Oil Corp. v Lione, 66 Misc 2d 599; Wagner Bldg, v United Cigar-Whelan Stores Corp., 203 Misc 382.)
In the case at bar, the landlord’s conduct could have so led Gibbs reasonably to believe her tenancy was being recognized and to rely on that belief in remaining in the apartment and in planning her future, and I find that to have been so. In so finding I rely primarily upon the three monthly rental payments tendered by Gibbs and retained by the landlord for April, May and June, 1983, because they were all in Gibbs’ own name and were tendered after the first holdover proceeding was discontinued. Moreover, I reject petitioner’s explanation that these checks were held on account of a mistake or confusion between the managing agent and his bookkeeper. On the contrary, I believe and find that they were deliberately retained by the land *36 lord to insure payment. Finally, I do not find that Double-down is protected from the estoppel effects of its conduct by virtue of its first holdover proceeding. Gibbs was entitled to rely on Doubledown’s unexplained retention and apparent acceptance of her money orders for three months after the discontinuance of the first holdover and before the commencement of the instant one.
Doubledown’s petition is therefore dismissed.v